IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                    Case Nos.:   1:07-cr-6-MP-GRJ
                                                    1:10-cv-93-MP-GRJ

HENRY F. PARRISH

_____/

## REPORT AND RECOMMENDATION

This matter is before the court upon Defendant's motion to vacate, set aside, or

correct sentence pursuant to 28 U.S.C. § 2255 and memorandum in support (docs. 69,

80).  The Government has filed a response (doc. 81) and Defendant has filed a reply

(doc. 88). After a careful review of the record and the arguments presented the

undersigned recommends that the motion to vacate be denied.

## PROCEDURAL BACKGROUND

Defendant was the lone defendant charged in a single count indictment with

possession of a firearm by a convicted felon (doc. 1).  Following a jury trial at which he

was represented by retained counsel David Mengers, Defendant was convicted as

charged (doc. 25).

The Presentence Investigation Report ("PSR") was disclosed to the defense on

July 25, 2007 (doc. 31).  The offense conduct, as set forth in the PSR, is as follows.[1]

Defendant Henry Parrish and Michael Colson met on December 26, 2005 and

---

[1]The defense identified no factual matters to which it took exception at sentencing, and as such the undersigned relies on the summary of the offense conduct contained therein.  *See* United States v. Patterson, 595 F.3d 1324, 1326 (11th Cir. 2010) (quoting United States v. Wade, 458 F.3d 1273, 1277 (11th Cir. 2006)) (failure to object to facts contained within PSR constitutes admission of those facts for sentencing purposes).

discussed hunting that evening (PSR ¶ 7).   Following their discussion, Colson retrieved

his Benelli Nova 12 gauge shotgun, and the two men drove to Payne's Prairie Preserve

State Park in Alachua County ("the Park") (PSR ¶ 7).   That evening, officers of the

Florida Wildlife Commission ("FWC") set up surveillance on a herd of deer in the Park

(PSR ¶ 8).  At approximately 2:00 a.m. on December 27, 2005, officers observed a

white pickup truck driven by Defendant Parrish drive by the herd several times and

shine a light, possibly his headlights, on the deer (PSR ¶ 8; doc. 61 at 3).  Colson was a

passenger in the truck (PSR ¶ 8).  Parrish passed by the herd and shot a deer from the

driver's side of the truck and the truck departed the scene (PSR ¶ 8).

FWC officers attempted to conduct a traffic stop and a chase ensued during

which Parrish  threw the shotgun out of the driver's side of the truck (PSR ¶ 9).  Parrish

finally stopped the vehicle and was arrested (PSR ¶ 9).  The search incident to arrest

revealed less than 20 grams of marijuana and rolling papers, and two separate types of

12 gauge shotgun ammunition and .300 Winchester Magnum ammunition (PSR ¶ 9).

Defendant's base offense level was 20 pursuant to § 2K2.1(a)(4) of the

sentencing guidelines (PSR ¶ 15).  Because Defendant was subject to an enhanced

sentence under 18 U.S.C. § 924(e), his offense level was 33 pursuant to § 4B1.4(a)

and (b)(3)(B) (PSR ¶ 21).  Because there were no further adjustments, his total offense

level was 33 (PSR ¶ 23).  Defendant's criminal history category was  V (PSR ¶ 38–40).

At sentencing, counsel objected to the calculation of Defendant's criminal history

category and to Defendant's qualification as an armed career offender pursuant to

924(e) based on a number of prior burglary convictions, most of which occurred while

Defendant was chronologically a minor (doc. 61 at 4–7). Counsel also argued that the court should consider a downward departure given Defendant's age when he committed the vast majority of his crimes, some tragic circumstances in his life, and the fact that the offense charged in this case did not involve violence or threat of violence to a human being (*id*. at 12). Defendant declined to speak in allocution (*id*.). The court overruled both of Defendant's objections, and stated that the guidelines had not been applied in an excessive or any other improper manner (*id*. at 13). It sentenced Defendant to a term of 235 months imprisonment, which was at the midpoint of the applicable guidelines range (*id*. at 14).

Defendant appealed, challenging both his conviction and his sentence (doc. 67). The Eleventh Circuit rejected his claim that there was insufficient evidence to prove his possession of the firearm (*id*. at 4–6), and found that Defendant was properly sentenced under the Armed Career Criminal Act ("ACCA") (*id*. at 6–8).

Defendant filed the instant motion, pursuant to the prison mailbox rule, on May 17, 2010 (doc. 69 at 13). He moved for an additional 45 days in which to file a brief in support of his motion (doc. 70), which motion was granted by the court (doc. 71). Defendant was given until July 5, 2010 to file is brief, and the United States Attorney was instructed to respond by August 4, 2010 (*id*. at 2). On July 9, 2010, the Government filed a document titled "Government's Reply to the Court's Order of May 25, 2010" (doc. 74) in which it noted that Defendant had not yet filed a response and argued that Defendant's initial motion was untimely (*id*. at 1, 3). Defendant filed a reply in which he argued that his motion was in fact timely filed (doc. 77).

Defendant filed a "Motion Seeking Leave to File the Petitioner's Brief in Support of his 28 U.S.C. § 2255 Motion to Vacate, Set Aside or Correct Sentence Out of Time" that was dated July 8, 2010, three days after it was to have been filed (doc. 75 at 3).  In the brief that was appended to the motion, Defendant provided a detailed argument with respect to his first ground for relief, adopted that same argument with respect to grounds two and four, and provided no further argument with respect to claims three and five through eight, noting an intent to brief these issues after the Government responds (doc. 75-1 at 32).  The Government filed a response in which it objected to the late filing of the brief, addressed the conflict claim (ground one) and addressed the remaining claims under the rubric of ineffective assistance of counsel (doc. 76 at 1, 4). The court rejected Defendant's attempt to assert his claims in a piecemeal fashion and directed him to file a single brief containing all of his arguments on or before August 26, 2010 (doc. 78 at 1,2).  It also rejected the Government's argument that the motion was untimely (*id*. at 2), and established a schedule for the filing of the Government's response and Defendant's reply (*id*.).  Defendant's memorandum was timely filed in accordance with this order, although it was well in excess of the twenty-five page limit imposed by the Local Rules of the Northern District of Florida (doc. 80).  The Government responded in opposition on September 13, 2010 (doc. 81).  On August 28, 2011, Defendant filed a "Motion Requesting an Order for Production of Documents" (doc. 85) in which he represented that he had never received a copy of the Government's response and requested a free copy of same (*id*. at 3).  The court denied

his request and instructed Defendant to file his reply on or before November 21, 2011

(doc. 87 at 2).  Defendant complied (doc. 88).

In the present motion, defendant raises eight grounds for relief, some of which

are interrelated.  He contends that counsel operated under a conflict of interest

precipitated by a pre-trial conversation with a witness, that he was deprived of his right

to cross-examine a witness as a result of this conflict, and that trial and appellate

counsel were constitutionally ineffective.  The Government contends that the motion

should be denied.[2]

## LEGAL ANALYSIS

### *General Standard of Review*

Because collateral review is not a substitute for direct appeal, the grounds for

collateral attack on final judgments pursuant to § 2255 are extremely limited.  A

prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1)

violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3)

exceeded the maximum authorized by law, or (4) is otherwise subject to collateral

attack.  *See* 28 U.S.C. § 2255(a); McKay v. United States, 657 F.3d 1190, 1194 n. 8

(11th Cir. 2011).  "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of

constitutional rights and for that narrow compass of other injury that could not have

been raised in direct appeal and would, if condoned, result in a complete miscarriage of

justice.'" Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations

---

[2] The Government's response, unfortunately, was woefully inadequate in addressing Defendant's claims.

omitted).  The "fundamental miscarriage of justice" exception recognized in <u>Murray v.</u>

<u>Carrier</u>, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged

constitutional violation "has probably resulted in the conviction of one who is actually

innocent . . . ."

　　　The law is well established that a district court need not reconsider issues raised

in a section 2255 motion which have been resolved on direct appeal.  <u>Rozier v. United</u>

<u>States</u>, 701 F.3d 681, 684 (11th Cir. 2012); <u>United States v. Nyhuis</u>, 211 F.3d 1340,

1343 (11th Cir. 2000); <u>Mills v. United States</u>, 36 F.3d 1052, 1056 (11th Cir. 1994);

<u>United States v. Rowan</u>, 663 F.2d 1034, 1035 (11th Cir. 1981).  Once a matter has

been decided adversely to a defendant on direct appeal, it cannot be re-litigated in a

collateral attack under section 2255.  <u>Nyhuis</u>, 211 F.3d at 1343 (quotation omitted).

Broad discretion is afforded to a court's determination of whether a particular claim has

been previously raised.  <u>Sanders v. United States</u>, 373 U.S. 1, 16 (1963) ("identical

grounds may often be proved by different factual allegations . . . or supported by

different legal arguments . . . or couched in different language . . . or vary in immaterial

respects").

　　　Furthermore, a motion to vacate under section 2255 is not a substitute for direct

appeal, and issues which could have been raised on direct appeal are generally not

actionable in a section 2255 motion and will be considered procedurally barred.  <u>Lynn</u>,

365 F.3d at 1234–35; <u>Bousley v. United States</u>, 523 U.S. 614, 621 (1998);  <u>McKay v.</u>

<u>United States</u>, 657 F.3d 1190, 1195 (11th Cir. 2011).  An issue is "'available' on direct

appeal when its merits can be reviewed without further factual development."  <u>Lynn</u>,

365 F.3d at 1232 n. 14 (quoting Mills, 36 F.3d at 1055).   Absent a showing that the

ground of error was unavailable on direct appeal, a court may not consider the ground

in a section 2255 motion unless the defendant establishes (1) cause for not raising the

ground on direct appeal, and (2) actual prejudice resulting from the alleged error, that

is, alternatively, that he is "actually innocent."  Lynn, 365 F.3d at 1234; Bousley, 523

U.S. at 622 (citations omitted).  To show cause for procedural default, a defendant must

show that "some objective factor external to the defense prevented [him] or his counsel

from raising his claims on direct appeal and that this factor cannot be fairly attributable

to [defendant's] own conduct."  Lynn, 365 F.3d at 1235.  A meritorious claim of

ineffective assistance of counsel can constitute cause.  *See* Nyhuis, 211 F.3d at 1344.

Ineffective assistance of counsel claims are generally not cognizable on direct

appeal and are properly raised by a § 2255 motion regardless of whether they could

have been brought on direct appeal.  Massaro v. United States, 538 U.S. 500, 503

(2003); *see also* United States v. Patterson, 595 F.3d, 1324, 1328 (11th Cir. 2010).

The benchmark for judging a claim of ineffective assistance of counsel is "whether

counsel's conduct so undermined the proper functioning of the adversarial process that

the trial cannot be relied on as having produced a just result."  Strickland v.

Washington, 466 U.S. 668, 686 (1984).  To show a violation of his constitutional right to

counsel, a defendant must demonstrate both that counsel's performance was below an

objective and reasonable professional norm and that he was prejudiced by this

inadequacy.  *Id.,* 466 U.S. at 686; Williams v. Taylor, 529 U.S. 362, 390 (2000); Darden

v. United States, 708 F.3d 1225, 1228 (11th Cir. 2013).  In applying Strickland, the

court may dispose of an ineffective assistance claim if a defendant fails to carry his burden on either of the two prongs. 466 U.S. at 697; Brown v. United States, ___ F.3d ___, 2013 WL 3455676 (11th Cir. July 10, 2013).

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688; *see also* Dingle v. Secretary for Dept. of Corrections, 480 F.3d 1092, 1099 (11th Cir. 2007). Reviewing courts are to review counsel's performance in a highly deferential manner and "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." Hammond v. Hall, 585 F.3d 1289, 1324 (11th Cir. 2009) (quoting Strickland, 466 U.S. at 689; Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation")). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. Strickland, 466 U.S. at 689. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); Chandler, 218 F.3d at 1315. When examining the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect." Chandler, 218 F.3d at 1316 n.18.

With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." Lockhart v. Fretwell, 506 U.S. 364, 369–70 (1993); Allen v. Secretary, Florida Dep't of Corrections, 611 F.3d 740, 754 (11th Cir. 2010). A defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Lockhart, 506 U.S. at 369 (quoting Strickland, 466 U.S. at 687). Or in the case of alleged sentencing errors, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. Glover v. United States, 531 U.S. 198, 203–04 (2001). A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." Id. at 203.

To establish ineffective assistance, Defendant must provide factual support for his contentions regarding counsel's performance. Smith v. White, 815 F.2d 1401, 1406–07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the Strickland test. See Boyd v. Comm'r, Ala. Dep't of Corrections, 697 F.3d 1320, 1333–34 (11th Cir. 2012); Garcia v. United States, 456 F. App'x 804, 807 (11th Cir. 2012) (citing Yeck v. Goodwin, 985 F.2d 538, 542 (11th Cir.

1993)); <u>Wilson v. United States</u>, 962 F.2d 996, 998 (11th Cir. 1992); <u>Tejada v. Dugger</u>,

941 F.2d 1551, 1559 (11th Cir. 1991); <u>Stano v. Dugger</u>, 901 F.2d 898, 899 (11th Cir.

1990) (citing <u>Blackledge v. Allison</u>, 431 U.S. 63, 74 (1977)); <u>United States v. Ross</u>, 147

F. App'x 936, 939 (11th Cir. 2005).

Finally, the Eleventh Circuit has recognized that given the principles and

presumptions set forth above, "the cases in which habeas petitioners can properly

prevail . . . are few and far between." <u>Chandler</u>, 218 F.3d at 1313.  This is because the

test is not what the best lawyers would have done or even what most good lawyers

would have done, but rather whether some reasonable lawyer could have acted in the

circumstances as defense counsel acted.  <u>Dingle</u>, 480 F.3d at 1099; <u>Williamson v.</u>

<u>Moore</u>, 221 F.3d 1177, 1180 (11th Cir. 2000).  "Even if counsel's decision appears to

have been unwise in retrospect, the decision will be held to have been ineffective

assistance only if it was 'so patently unreasonable that no competent attorney would

have chosen it.'" <u>Dingle</u>, 480 F.3d at 1099 (quoting <u>Adams v. Wainwright</u>, 709 F.2d

1443, 1445 (11th Cir. 1983)).  The Sixth Circuit has framed the question as not whether

counsel was inadequate, but rather counsel's performance was so manifestly

ineffective that "defeat was snatched from the hands of probable victory." <u>United States</u>

<u>v. Morrow</u>, 977 F.2d 222, 229 (6th Cir. 1992).

Although section 2255 mandates that the court conduct an evidentiary hearing

"unless the motion and files and records conclusively show that the prisoner is entitled

to no relief," a defendant must support his allegations with at least a proffer of some

credible supporting evidence. *See* <u>Chandler v. McDonough</u>, 471 F.3d 1360, 1363 (11th

Cir. 2006) (citing <u>Drew v. Dept. of Corrections</u>, 297 F.3d 1278, 1293 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); <u>Hill v. Moore,</u> 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief."); <u>Ferguson v. United States</u>, 699 F.2d 1071, 1072 (11th Cir. 1983).  A hearing is not required on frivolous claims, conclusory allegations unsupported by specifics, or contentions that are wholly unsupported by the record.  <u>Peoples v. Campbell</u>, 377 F.3d 1208, 1237 (11th Cir. 2004); <u>Tejada</u>, 941 F.2d at 1559; <u>Holmes v. United States</u>, 876 F.2d 1545, 1553 (11th Cir. 1989) (citations omitted).  Likewise, affidavits that amount to nothing more than conclusory allegations do not warrant a hearing.  <u>Lynn</u>, 365 F.3d at 1239.

### *Grounds One, Two, Three, Four and Seven:  Conflict of Interest*

Five of Defendant's claims for relief center around an alleged conflict by counsel's knowledge of an allegedly exculpatory and contradictory statement made by the Government's "star witness," Michael Colson, who provided the only eye witness testimony linking Defendant to the shotgun.

The jury trial was held in this case from June 12 through June 14, 2007.  During defense counsel's opening statement, he told the jury that it was only Michael Colson who had possession of the firearm in the early morning hours of December 27, 2005 and that Defendant never possessed, held or fired the gun (doc. 57 at 22–23).  Counsel stated that Colson was out hunting, missed his ride, and called Defendant to come out

to the Park to pick him up (*id*. at 23).  When Defendant arrived, Colson took him into the

Park to show him places where the deer were visible, and Defendant turned his vehicle

to shine his headlights into the woods where he saw the deer (*id*. at 24).  After doing

that, they left the area and were stopped by wildlife officers (*id*.).[3]  At that point Colson

allegedly lied to the officers and told them that Defendant was the one who had done it

(*id*. at 24–25).  Counsel argued that Colson changed his story and then changed his

story again before trial to exonerate himself (*id*. at 25).  It is the evidence supporting

counsel's reference to Colson's purported waffling that is at issue here.

Michael Colson testified at trial that Defendant came to Colson's house at about

9:00 or 10:00 p.m. on December 26 (doc. 59 at 111).  Colson said that he had been

drinking before Defendant arrived (*id*. at 112).  Colson brought up the subject of

hunting, and the two men left in Defendant's truck with Colson's Benelli 12 gauge

shotgun to look for deer (*id*. at 112–113).  They also brought Defendant's Seagrams 7

liquor (*id*. at 113).  The men ended up in the Gainesville area, approximately 25 miles

away from where Colson lived because Defendant had seen some deer in that vicinity

(*id*. at 113–114).  The men were in the area for about an hour or so before Defendant

slowed down and fired the gun one time out the driver's side window of the truck (*id*. at

115).  The men proceeded down the highway to "leave that area for a few minutes" out

of concern that someone was around (*id*.).  They noticed that they were being followed

when they saw headlights behind them, and when the blue lights of the FWC vehicle

---

[3] Counsel did not mention a weapon being fired.

came on, Defendant said "we have got to get rid of this gun" (*id*. at 116–117).

Defendant threw the gun out the driver side window of the truck (*id*. at 117). After the

gun had been thrown, Colson told Defendant to stop the vehicle because law

enforcement was upon them (*id*. at 118). Colson admitted that when he was talking to

Officer Losee that he did not initially confess to hunting (*id*. at 119). Subsequently he

told Losee that the men had been out looking for deer, fired the weapon and then threw

it out the window after they saw that they were being pursued (*id*. at 119–120). Colson

was charged with unlawful hunting that evening, and he provided a written statement to

law enforcement in his own writing (*id*. at 120–122). Colson read the statement to the

jury (*id*. at 123). Although the statement did not mention the disposition of the gun, it

did state that Defendant was the one who shot at a deer (*id*.).[4]

On cross examination, Colson admitted that he was intoxicated on the evening in

question, that he frequently hunted and had been arrested previously for hunting

illegally, and that he knew it was illegal to hunt in the manner they were hunting that day

(doc. 59 at 124–125). Colson said he had moved from Florida to Kentucky and was

contacted by someone from the State Attorney's Office (*id*. at 125). At this juncture, the

Government requested a sidebar.

The Assistant U.S. Attorney argued that defense counsel was going to try to

improperly impeach the witness, to which defense counsel responded that Colson had

made contrary statements to counsel and a Mr. Hechavarria by phone (doc. 59 at 126).

---

[4] In the statement Colson also denied responsibility for drugs found in the vehicle.

The court excused the jury to allow defense counsel to continue his line of questioning

as a proffer (*id*.).  During the proffer, Colson was asked about an October 13, 2006

telephone conference involving Colson, Omar Hechavarria, from the State's Attorney's

office, and Defendant's trial counsel David Mengers.  Colson testified that during this

call, he had told the men that on the evening in question, law enforcement informed him

that if he signed a statement about the events, that he could go home (*id*. at 128).

Counsel then asked Colson whether Colson said during that phone conversation that

Colson did not hear any shooting on the night the men were arrested, or that there was

no shooting, or that he did not remember any shooting (*id*. at 128–129).  In response to

the question Colson testified that he did not recall what was said during the short phone

conversation other than that he had been drinking[5] and could not remember a whole lot

of what happened (*id*. at 129–130).  After hearing the proffered testimony, the

Government argued that unless there was something to refresh Colson's recollection

about what he told defense counsel and Hechavarria, there was no basis for

impeachment because Colson insisted that he did not remember (*id*. at 130).  Defense

counsel asked Colson whether Colson thought his memory could be refreshed by

looking at some notes taken from the conversation (*id*. at 131).  The Government

objected to counsel's attempt to use his own notes to refresh the witness's recollection

(*id*.).  The court confirmed the informal nature of the conversation and that the

---

[5] Colson already had admitted he was intoxicated on the evening and early morning hours of December 26–27, 2005.  However, one possible interpretation of counsel's questions and Colson's responses is that Colson had been drinking at the time of the October telephone conversation, which could explain why he did not recall the conversation.

statement had been neither recorded nor sworn.  The Court consequently ruled that it would not allow defense counsel to use his own notes to refresh Colson's recollection because "We don't want you to become a witness.  We need you as a lawyer in this case.  I assume you are not going to make that decision to testify?" (*Id*. at 132). Counsel acknowledged that he could not testify, and that even calling Mr. Hechavarria to lay the appropriate foundation would create evidentiary problems (*id*.).  The court sustained the Government's objection, noting that the record was preserved for appellate purposes (*id*.).

Cross examination proceeded upon the return of the jury (doc. 59 at 133). Colson admitted that he did not remember many of the events of that day due to his intoxication (*id*.).  Colson testified that law enforcement told him if he wrote a statement, he would be released, and he noted that the statement did not disclose how the gun had been disposed of that night (*id*. at 133–134).  He acknowledged that it was his knife and shotgun shells that were confiscated by law enforcement that night (*id*. at 135).  On re-direct, Colson testified that the statement was written at the scene contemporaneous with the events, and that he had orally informed the officers at the time about the location of the gun (*id*. at 135–36).

Defendant now argues in ground one that counsel operated under a conflict of interest because he was forced to decide whether to become a witness in the trial or to forego the possible benefit of any testimony that he might be able to offer about the statement made by Colson during the telephone call. (doc. 80 at 29).

Unlike witnesses, whose interests may differ substantially from the parties' attorneys assume an ethical obligation to serve their clients' interests. Cunningham v. Hamilton County, Ohio, 527 U.S. 198, 206–07 (1999) (citing Evans v. Jeff D., 475 U.S. 717, 728 (1986)).  In criminal cases, an attorney's conflict of interest may deprive a defendant of his Sixth Amendment right to assistance of counsel. Strickland, 466 U.S. at 692 (1984); Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).  The existence of a conflict of interest does not automatically require reversal.  Mickens v. Taylor, 535 U.S. 162, 168 (2002).  A conflict of interest will rise to the level of reversible constitutional error only if the defendant has demonstrated that "an actual conflict of interest adversely affected his lawyer's performance," Id. (citing Cuyler, 446 U.S. at 348–349).   Prejudice is presumed when there is an actual conflict of interest.  Id. at 172 n.5 (citing United States v. Cronic, 466 U.S. 648, 662 n. 31).  To be entitled to relief, a defendant must show an actual conflict of interest that is "more than a possible, speculative, or a merely hypothetical conflict." Reynolds v. Chapman, 253 F.3d 1337, 1342–43 (11th Cir.2001) (internal quotation omitted).  To prove adverse effect, a petitioner must demonstrate three elements: (1) "that the defense attorney could have pursued a plausible alternative strategy"; (2) "that this alternative was reasonable"; and (3) "that the alternative strategy was not followed because it conflicted with the attorney's external loyalties."  Aguilar-Garcia v. United States, No. 12-11643, 2013 WL 1776704 (11th Cir. 2013) (quoting Reynolds v. Chapman, 253 F.3d 1337, 1343 (11th Cir. 2001)).  A potential conflict of interest exists if the interests of the defendant may place the attorney under inconsistent duties at some time in the future.  See Cuyler, 446 U.S. at

356 n. 3. A trial court has a duty to inquire into the conflict when it "knows or reasonably should know that a particular conflict exists." <u>Mickens</u>, 535 U.S. at 168 (citing <u>Cuyler</u>, 446 U.S. at 347).

The Government has not submitted an affidavit from defense counsel. Thus, the court is not privy to what was said during the October 2006 conversation involving Colson, counsel and Mr. Hechavarria other than what can be gleaned from the proffer, which is minimal. Colson denied remembering much of the telephone conversation by the time of trial, eight months later. Comparing Colson's testimony during the proffer with Colson's testimony during cross examination, the only evidence that was not presented to the jury was the fact that Colson may have told defense counsel something to the effect that he did not hear or he did not recall any shooting on the night in question (doc. 59 at 129–130). Defendant argues that such a statement contradicts both the written statement Colson provided to law enforcement contemporaneous with the men's arrest as well as Colson's testimony at trial (doc. 59 at 116). Defendant claims that counsel's first hand knowledge of Colson's inconsistent statements and his inability to cross examine Colson about them gave rise to a "conflict."

The potential value of this impeachment evidence can be viewed in two lights. Colson was, as Defendant notes, the "star" Government witness in the sense that there was absolutely no physical evidence linking Defendant directly to the shotgun, and no other eye witness testimony. Colson was the only witness who was able to testify that Defendant actually possessed the shotgun, and the value of impeachment evidence

against him was potentially magnified.  On the other hand, a statement allegedly made during a single, brief, unsworn conversation with defense counsel of which the witness insisted he had virtually no recollection is not material "smoking gun" evidence that would have unquestionably altered the outcome of this case.  If the testimony suggested by the proffer had been presented, at best, the jury would have learned that, eight months prior to trial, during a brief conversation with defense counsel and an Assistant State's Attorney, Colson made a comment (which he no longer recalled) suggesting, (at least to defense counsel), that no shots were fired on the night in question.  It is certainly true that statements a witness makes that are inconsistent with those made at trial may properly be used for purposes of impeachment.  United States v. Manor, 936 F.2d 1238, 1242 (11th Cir. 1991).  If Colson told counsel and the assistant State's Attorney in October that no shot was fired, this statement was different with his own written statement prepared contemporaneously with the event as well as different from his testimony at trial (doc. 59 at 116, 123) and that of the other witnesses.[6]  Notably, however, the issue of whether the gun was fired was a collateral matter not relevant to the core issue of this case: possession or constructive possession of a firearm by a convicted felon.  The Government argued in closing argument, and the jury was instructed, that possession could be sole, joint or even constructive (doc. 60 at 34, doc. 24 at 11).[7]  Whether the weapon in question was fired

---

[6] FWC Officers Jordan and Losee both testified that they heard a single shot (id. at 15, 33, 84, 108), and Defendant Parrish testified that a single shot was fired (id. at 201).

[7] With respect to constructive possession the jury was told: "A person who is not in actual possession, but who has the power and the intention to later take control over something either alone or together with

was immaterial to the disposition of the case. Because the excluded testimony related to a collateral matter immaterial to a finding of guilt, Defendant's counsel was not required to testify (nor would the Court have permitted him to do so if he attempted to testify) and thus there was no actual conflict of interest. The Defendant, therefore, was not deprived of his sixth amendment right to conflict-free counsel.

Grounds two and four, as well as a portion of ground one, relate to the trial court's failure to advise Defendant about his right to conflict free representation and investigate the potential conflict. As part of ground one, Defendant faults the court for failing to advise him of his right to conflict-free representation In ground two, Defendant argues that the district court erred when it failed to hold a "Garcia hearing." In ground four he argues that appellate counsel was ineffective for not challenging the court's failure to hold the Garcia hearing on appeal. Although Defendant cites United States v. Garcia, 447 F.3d 1327 (11th Cir. 2006), the origin of the term of art "Garcia hearing" appears to have been United States v. Garcia, 517 F.2d 272, 278 (5th Cir. 1975), *abrogated on other grounds by* Flanagan v. United States, 465 U.S. 259 (1984). *See* United States v. Schultz, 565 F.3d 1353, 1357 n.2 (11th Cir. 2009); United States v. Saint Surin, 477 F. App'x 683, 685 n.3 (11th Cir. 2012). The Fifth Circuit Court of Appeal was presented in Garcia with a situation where attorneys were representing multiple criminal defendants and/or witnesses. It established the following procedures for safeguarding parties' rights in potential instances of conflict:

---

someone else, is in constructive possession of it." (Doc. 24 at 11).

As in Rule 11 procedures, the district court should address each
defendant personally and forthrightly advise him of the potential dangers
of representation by counsel with a conflict of interest. The defendant
must be at liberty to question the district court as to the nature and
consequences of his legal representation. Most significantly, the court
should seek to elicit a narrative response from each defendant that he has
been advised of his right to effective representation, that he understands
the details of his attorney's possible conflict of interest and the potential
perils of such a conflict, that he has discussed the matter with his attorney
or if he wishes with outside counsel, and that he voluntarily waives his
Sixth Amendment protections.

Garcia, 517 F.2d at 278.  However, "a district court's failure to comply with Garcia will

not require reversal absent an actual conflict of interest."  United States v. Saint Surin,

477 F. App'x 683, 686 (11th Cir. 2012)(citing United States v. Mers, 701 F.2d 1321,

1326 (11th Cir. 1983) (holding that a district court's violation of Garcia was harmless

error because there was no actual conflict).  Because Defendant's counsel did not have

an actual conflict of interest in this case, the trial court had no responsibility to conduct

a Garcia hearing. Likewise, appellate counsel was not constitutionally ineffective for his

failure to raise this non-meritorious issue on appeal.  Defendant's grounds two and four

are due to be denied.

In ground three, Defendant argues that trial counsel was ineffective for not

seeking to introduce the exculpatory[8] and contradictory statements by other means

(doc. 80 at 32).  He offers no suggestion about how this could have been done, and

admits that he is uncertain if counsel had any other avenue to impeach Colson with his

prior statements. Moreover, Colson never denied that he stated during the telephone

---

[8] Defendant's characterization of the statements as exculpatory is misleading and inaccurate because
Defendant admitted a shot was fired that night.

conversation that no shots were fired the night he and Defendant were arrested.
Rather, Colson testified that he did not remember what he said, possibly because he
was intoxicated.

As part of this claim Defendant faults counsel for failing to conduct witness
interviews with the assistance of an investigator, because had such a person been
present on the line during the phone conversation in question, she or he could have
provided the testimony that counsel was unable to provide. Similarly, he argues that
counsel could have tape recorded the conversation, although the admissibility of such a
recording or a transcription thereof is questionable. *C.f.* United States v. Manor, 936
F.2d 1238, 1241–42 (11th Cir. 1991) (disallowing use of transcript of an interview
between counsel and a witness for cross examination).

While Colson's statement during the telephone call may have shown a tendency
to change his story to suit his audience or his interests the fact remains that the
statements related only to an uncontested matter not germane to a finding of guilt in
this case. Therefore, counsel's failure to have conducted the interview with the use of
an investigator or to have tape recorded the conversation was not constitutionally
deficient, and Defendant is not entitled to relief.

Finally, in ground seven, he contends that he was deprived of his sixth
amendment right to full and effective cross-examination. This claim fails because
Colson testified at trial and was thoroughly cross-examined by counsel. Counsel's
inability to present evidence about the telephone conversation did not affect

Defendant's rights under the Confrontation Clause and Defendant is not entitled to relief on this claim.

In sum, Defendant has failed to show ineffective assistance of counsel based upon an alleged conflict of interest and he is not entitled to relief on any of the foregoing claims.

### *Ground Five: Counsel's decision to call Ms. Ford as witness*

Defendant next contends that trial counsel was ineffective for calling Defendant's former girlfriend as a defense witness, thus opening the door to prejudicial evidence against him.

Defendant's ex-girlfriend Samantha Lynn Ford testified that on the evening of Defendant's arrest, he received a phone call after they had gone to bed. After the call, he told her he had to go pick up a friend and left the house (doc. 59 at 171–172). Later that night, she received a phone call that he had been arrested (*id*. at 171). Her testimony was the only evidence besides the testimony of Defendant and Colson – each of whom arguably had some self interest – about how Defendant came to be at the Park with Colson that night.

During cross-examination, the Government sought to question Ford about a 2002 incident involving Defendant and a shotgun.[9] Defense counsel objected stating that he had not "seen this before" and he did not "know the relevance of that" (doc. 59 at 176–177). When the Government explained that the witness and her brother had

---

[9] Ms. Ford testified on direct that she had never seen Defendant with Colson's shotgun before, but not that she had never seen Defendant with any shotgun (doc. 59 at 172).

hidden a weapon from police to avoid Defendant's arrest, defense counsel argued that the prejudicial impact of such testimony outweighed the probative value (*id*.). The court allowed the evidence to come in for the limited purpose of showing bias and prejudice, drawing a parallel because in similar circumstances involving firearms, Ms. Ford took steps to protect Defendant (*id*. at 177–178). Defense counsel requested a limiting instruction (*id*. at 178), and the court later obliged (*id*. at 183–184).

With respect to the earlier incident, Ms. Ford testified that in February of 2002, she and her brother were present in a vehicle when Defendant fired a shotgun (*id*. at 178–179). After the incident, she and her brother took the shotgun to her house and put it in a nearby yard or field and it was set on fire (*id*. at 180). She admitted that when they discovered that it had not burned up, they retrieved it and brought it back to her house to keep the police from finding it (*id*.). Although not a focal point of its case, the Government mentioned in closing that Ford had previously involved herself with Defendant in trying to hide a weapon (doc. 60 at 37).

Based on the statements made by defense counsel at the time he made his objection (doc. 59 at 176), it appears that he was unaware of the 2002 incident. Counsel, however, cannot be deemed constitutionally ineffective for his decision to call Ms. Ford as a witness if he did not know, and Defendant failed to inform him of these events from five years earlier. *See* United States v. Fields, 565 F.3d 290, 295 (5th Cir. 2009) ("Clairvoyance is not a required attribute of effective representation."). Moreover, counsel did his best to downplay this testimony and not bring further attention to the

incident by asking additional questions on re-direct examination or by mentioning it in his closing arguments. This claim is due to be denied.

### *Ground Six–Failure to properly challenge armed career criminal status*

Defendant asserts that he should not have been designated as an Armed Career Criminal pursuant to § 924(e), citing a non-binding First Circuit case for the proposition that generic burglary is not a crime of violence.  Defendant has not explained what arguments counsel could or should have made that would have altered the outcome of the proceedings.  Furthermore, the propriety of the ACCA enhancement was reviewed de novo on appeal (doc. 81-4 at 4–6) and may not be relitigated in a 2255 motion. Rozier, *supra*; Nyhuis, *supra.* Defendant, therefore, is not entitled to relief on this claim, and it should be denied.

### *Ground Eight–Failure to prepare Defendant to testify*

Defendant Parrish testified in his own behalf at trial (doc. 59 at 184–211).  He now contends that counsel failed to properly prepare him to testify.  He further contends that counsel  "compelled him to testify because of counsel's conflict regarding his own testimony." The Government failed to address this claim, other than to identify it in passing (doc. 81 at 2).

At trial, after the Government rested, the court asked defense counsel whether his client had decided if he wanted to testify.  Defendant personally responded that he would testify (doc. 59 at 169).  During his testimony, Defendant denied possessing, touching or shooting the shotgun (doc. 59 at 185, 191).  He said that Colson had called him to come and pick Colson up on the evening in question as Colson was out hunting

and had missed a ride (*id*. at 185). Defendant located Colson, who had his shotgun with him, and although he had been out hunting since well before dark and it was then around midnight, Colson convinced Defendant to drive around a bit looking at the deer (*id*. at 186–87). According to Defendant, at some point, Colson climbed into the back seat of the truck and shot at a deer (*id*. at 188). After the deer was shot, Defendant continued driving and Colson told him that they needed to get rid of the gun, which Colson did by throwing it out the window (*id.* at 188–190). After Colson got rid of the gun, he climbed back into the front seat (*id*. at 190). Defendant testified that he made one or two turns after he saw headlights behind him, but that he stopped his truck when he saw the blue lights (*id*. at 190).

On cross examination, Defendant admitted that he had been convicted of ten felonies (doc. 59 at 191). He also stated that he had been drinking that day, and that the alcohol in the truck was all his–Colson had not been drinking from his bottle (*id*. at 194–195). When asked about the rifle shells in his truck he said that they were not his but he guessed one could say that they were his, and finally said that he did not "have a gun that they relate to" but that the "30 06 shells" were his (*id* at 197–198). Defendant admitted that he knew he was involved in illegal conduct, both the hunting and drinking and driving (*id*. at 200–201, 211). With respect to the firearm, he said he was not in charge of it but added "I guess you could say I had control of it somewhat, it being in my vehicle" (*id*. at 211).[10]

---

[10] The Eleventh Circuit cited this statement as part of the evidence against Defendant (doc. 67 at 5).

It is axiomatic that a criminal defendant has the right to testify in his or her own defense.  Rock v. Arkansas, 483 U.S. 44, 49 (1987); McGriff v. Dept. of Corrections, 338 F.3d 1231, 1237 (11th Cir. 2003); Gallego v. United States, 174 F.3d 1196, 1197 (11th Cir. 1999); United States v. Teague, 953 F.2d 1525, 1534 (11th Cir. 1992).  This right is fundamental and personal to the defendant, such that it may not be effectively waived by counsel against the defendant's will.  Gallego, 174 F.3d at 1197; Teague, 953 F.2d at 1532.  When a defendant asserts that he wishes to testify, counsel has a duty to inform the defendant why he believes this course will be unwise or dangerous, if this is in fact true.  See United States v. Moody, 977 F.2d 1425 (11th Cir. 1992).  However, a defendant's  assertion that counsel's failure to prepare him to testify requires factual support to establish prejudice within the meaning of Strickland.  See Hall v. Head, 310 F.3d 683, 701 n.9 (11th Cir. 2002); see also Namur-Montalvo v. United States, Crim. No. 1:05-CR–477-CC-GGB-16; 2013 WL 1797104 (N.D. Ga. Apr. 26, 2013); Rayburn v. United States, 489 F. App'x 871, 872 (6th Cir. 2012) (not only was defendant not informed of dangers of testifying and not prepared to testify, but he was asked only two perfunctory questions on direct examination before counsel "sacrificed him to a lengthy and hostile cross-examination").

In this case, defendant claims that counsel's failure to advise him was prejudicial, but he provides no factual basis for this conclusory assertion.  He does not suggest – for instance –  what counsel could or should have told him that would have changed either the content of his testimony or his decision to testify, and how the outcome of the proceedings would have been different had such advice been offered.  Furthermore, to

the extent Defendant volunteered any information that was incriminating, rather than the testimony being elicited by counsel, counsel's performance was not ineffective. *See* Rhodes v. Medina, 437 F. App'x 727, 732 (10th Cir. 2011). Accordingly, this claim is due to be denied.

## Certificate of Appealability

Section 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2255 11(b).

After review of the record, the court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully **RECOMMENDED**:

1. The motion to vacate, set aside, or correct sentence (doc. 69) should be **DENIED**.

2. A certificate of appealability should be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this 7th day of August 2013.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties. Failure to object may limit the scope of appellate review of factual findings.** *See* **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**